Thank you, Your Honor. May it please the Court, Michael Rubin for the plaintiffs. I'd like to reserve five minutes for rebuttal, please. The District Court's summary judgment rulings in this case must be reversed, because the evidence presented and the inferences that could be drawn from that evidence were sufficient for the jury to conclude that McDonald's was plaintiff's joint employer, directly or indirectly or through an agent or other person, under any one or all three of the tests for employer status under California law. Help me with something. I was trying to find the strongest precedent that was in point on your side of the case, and I couldn't find another national franchisor who was held to be the employer of the local franchisee's employees or the joint employer. I, of course, read that strawberry case where the buyer of the strawberries is considered a joint employer, but it looked to me like in that case, if I've got it right, it wasn't a franchisor, it was the buyer, and also the buyer walked around the fields with the pickers and told them how to pack their strawberries. No, no, don't put that one in the box. It's rotten. Pack them this way so they won't crush the strawberries below them, that sort of thing. What is your best case where it's factually more or less analogous, a franchisor being treated as a joint employer with a franchisee of the franchisee's employees? JTX Tax and the case that the California Supreme Court cited for Massachusetts, the DiPiante v. Jan Crow franchising case, but this is a factual inquiry. We are not contending with Donald Trump. The three cases that you think are the strongest for you are JTX, DiPiante, and which one? That the panel asked on August 30th. The panel asked whether it's possible under California law, and remember there are three separate tests here independently, whether a company can be a joint employer for one claim but not another. The answer to that question appears to be yes under the third test, the common law test, because that rests on principles of agency and one, under California law, may be an agent for limited purposes without being an agent for all purposes. Yeah, that seemed to be the import of the way. Patterson, I thought, was interesting, but left a lot of questions in my mind because it seemed to use language that could go both directions, but the thrust of the discussion seemed to be whether there was control over this one aspect of employment, that is the sexual harassment policy in that case, and didn't really talk about whether there might have been a necessity to control wages, hours, and other working conditions. That's right. So it's kind of a function by function question then. It isn't necessarily a function, but you start with the function. And let me go back to JTH tax because that provides a good example. JTH tax, like Patterson, was a master-servant vicarious liability common law case, which as we now know from the California Supreme Court's decision in dynamics, is not the way you weight the factors when you've got the common law third prong under Martinez, which focuses on statutory purpose. But in JTH, the question was whether a franchisor was liable for deceptive advertising issued by its franchisee. What the court of appeal in the 2013 decision in California said was, if you look at the fact that in the franchise agreement, the franchisor retains the power to review the advertising, supervise the advertising, that is sufficient. And what the court said is there are agents at a minimum for purposes of advertising. But then the court went on to say, but if you look overall and you see that the franchisor, as in this case, reserved the right unilaterally to modify the operations manual at any time, and provided that breaches of the franchise agreement could result in the franchisee's termination, the court indicated that if the issue weren't limited to tort liability, vicarious liability even for wrongful acts, it might well have found that the franchisee was the agent for all purposes. I don't understand why that does the job for you. In this case, or a case like it, the franchisor carefully draws up the franchise agreement so that they have no power to hire and fire employees and cannot supervise employees. Now they can supervise the franchisee. For example, the deal between McDonald's and the local franchisee requires things like, oh, I don't remember exactly, clean bathrooms. So they're going to send an inspector around from time to time who's going to go to the bathroom, see if it's clean. And if it's not clean, well, then what's he going to do? He's going to tell the franchisee, not the new employee who's supposed to be cleaning the bathrooms, that the bathrooms here are a real problem. And then the franchisee is going to tell whoever's supposed to clean the bathrooms, I could get in trouble with McDonald's Regional if you don't do a better job here. And he can fire whoever's doing it. But McDonald's Regional can't. If those were the facts, it would be a different case. In this case, however, there is direct control. Not only is there evidence that the various auditors and reviewers personally interacted with the employees, but it's more. If you compare the franchise agreement in this case to direct them specifically what to do, and moreover, we start with the principle that under California, change the way you're dealing with employees. Tell customers you have to ask specific questions about ordering additional items. You have to stand in a different place. Remember that under California law, you are an employer under any of these three tests if you directly or indirectly or through an agent have the right to control the material terms and conditions. That's why I asked the question I did about function to function. Because if all you're doing is saying, you know, stand over here, that really isn't about wages or rest breaks. It's about something else. I guess in answering Judge Kleinfeld's question, if you could be specific to the claims that are being made, it would be helpful. I'll be very specific. We presented in our briefs three broad categories, only the third of which I think Judge Kleinfeld addressed. The first is the direct cause of the violations. Because of the pre-installed, pre-programmed ISP, in-store processor, there are two overtime violations that are key in this case. The McDonald's was exclusively and solely responsible for causing. First, because it set it in violation of California labor laws so that overtime wouldn't kick in until after nine hours rather than eight hours daily. Second, because overtime wouldn't kick in until after 50 hours of work rather than 40 in a week. I thought their instructions said that the franchisee is supposed to conform the software to the local laws. No, that's absolutely incorrect. This cannot be changed. Once those labor law settings are set, the franchisee is bound. Franchisee said there was no training on how to set them. Certain of the ISP settings, including these, could not be changed by a franchisee. Regardless, if there's conflicting evidence, we're here on summary judgment. So even if your evidence isn't ultimately believed, if there is such evidence, that's enough. Absolutely. And I will go through some of these specific examples, pointing out that a jury could, viewing them cumulatively, conclude that McDonald's- Tell me if you happen to have it right handy there. You probably have a yellow sticky on it. The page number of the excerpts I should read that shows that McDonald's locked in the software on breaks and that sort of thing. Yes, I will get that. And when I come back, Your Honor, in three of the restaurants, McDonald's owned them before the Haynes took them over, and they were set by McDonald's before Haynes took them over. The fourth restaurant, in the Walmart, it was pre-programmed by McDonald's before it came in. And the testimony, I will give you the exact pages. Secondly, I talked about the first overtime violation. The second overtime violation is the one that the Superior Court in Sanchez in L.A. found. That is, the ISP set time so that if you worked, all time was attributed to the day a shift started rather than the day the work was performed. So if you work an overnight shift followed by a day shift and you have more than eight hours that second day, you are not paid overtime. That's a violation of California law. That's what's been held in the case against the McDonald's-owned restaurants. As far as meal periods, there is a specific direction. This is not from the ISP. These are directives, specific directives from McDonald's to the franchisees in the training for the general managers and pointed out in the instructions at these audits that are regularly taken. You can't leave the store when the lobby is closed. I think there's a problem with the word you. As I recall, all the directions were to the franchisee rather than the franchisee. That's correct. That's not entirely correct. But in this instance, the franchisee is told that you are not permitted to allow a crew member to leave the premises during an overnight shift when the lobby is closed. That is a violation alleged in our complaint because it violates Brinker that entitles employees to be free entirely from the employer's control. If you are prohibited from leaving- I think also on the software, McDonald's in its franchise agreement says you don't have to use this software. No. And the evidence was that the franchisees would prefer to use it because it's a lot cheaper than hiring a bookkeeper to do the same thing. First, if that were the case, that itself would be a sufficient fact issue for the jury. Is it optional or not? But, in fact, if you go to the language of the franchise agreement, there is directive after directive. You have to strictly adhere to the McDonald's system, including all of the business manuals and policies, including the ones that we've identified in our briefing. You have to follow those directives or there's a whole series- Does the franchise agreement say you have to use the software? Yes. Yes, absolutely. It flatly says you have to use the software to open and close the store and for sales. The software comes with a fixed price. It's also fixed and solved. That software has applications for timekeeping, scheduling, and the like. The only way that McDonald's can conduct the audits is through the data received from the software. That was on sales because on sales, the National McDonald's gets a percentage. Right. They base their income on the gross sales, but this is a suite of- Do you have to use the software for labor? Every franchisee does and McDonald's charges the same amount whether they use it or not. The reports that are required to be made for the evaluation- Well, an incentive and a requirement are two different things. They're required to use the automatic debit and credit transfer system, but that's not what you're talking about, right? They are required. That's correct. They are required to use the ISP to open and close the store and for sales. The ISP comes with- Once McDonald's transferred from the ISP, they told everyone that ISP was obsolete. They had to move to the new system. All of the automatic updates, the franchisees had no right to reject, and as Catherine Slater Carter, another franchisee, explained, the reason that all of the franchises comply is they are trained how to use it. The training wouldn't work without it. That is the key system that McDonald's uses in order to track the staffing, the positioning. When McDonald's issues the audit reports and the action plans telling the franchisee what the franchisee must do because McDonald's has identified crew members who are in violation of McDonald's requirements, it's based on the data that came out from this ISP program. If a franchisee-and, again, we have the testimony from Bobby Haynes Sr. and Jr. that they believe that they had to be compliant, but if the franchisee didn't use this, then they would run the risk of being ineligible for growth and rewrite, for being put into the IPER improvement performance for underperforming restaurants program. The national franchising standards say, and this is page 1951, they wouldn't be eligible for other programs and incentives. I have one question about what you just said. Why does someone's belief make a difference if their belief is mistaken? In other words, what if the-this isn't the fact, but this hypothetical kind of gets at my concern. What if the agreement said, we will offer you a software package, but you don't need to use it, and someone testified, well, I thought I had to use it. If there's no additional fact, like someone came and told me specifically, ignore that provision, you must use it. Why does the belief make any difference at all? It's not as much the belief of the franchise. That's evidence from which a jury could draw the inference that McDonald's intended for them to use it, structured its review and sanctions based on whether they use it. The question for the jury here- But that's an incentive, not a requirement, and that is different. Illegally, is it not? No. In this instance, under the California principles, under the three tests, including suffering or permitting the unlawful conditions to occur, which is what happened, including on the directives that you must ensure that no rest break is taken during peak periods, it is McDonald's intent to dictate certain results that is ultimately for the jury to determine. The fact that the franchisee reasonably believed that it was a directive is evidence from which a reasonable inference could be drawn that it was, in fact, a requirement. A practical requirement, as well as a contractual requirement, would be sufficient to establish the right of control. And if you look at the language in paragraphs 1, 4, and 12 of the franchise agreement, as well as the provision in paragraph 14 that says you franchisees are prohibited from hiring anyone who worked for any McDonald's entity, including another franchisee, within the past six months- Counsel, what does that have to do with anything? That's control over hiring, firing, workplace conditions, which is the first test under California law. Yes, Judge Kleinfeld. Let me get back to what sounded like the strongest case you have of where McDonald's says to the franchisee it must do something which violates California labor law, and that's you can't let your employees out at night on their breaks. I would think that a franchisee might very much like to make his employees stay in the store during breaks if it was a bad neighborhood with sketchy people around the McDonald's and the McDonald's parking lot at night. You might tell them, look, don't go outside. Have your breaks in here where it's safe. On the other hand, national or rather state labor law might say you have to let your employees leave your store during breaks. Does McDonald's franchise agreement make that mandatory, and do they make McDonald's make it mandatory for their employees? What is exactly the relationship between leaving the premises on breaks and control of the employees? It is a violation of California law to be prohibited from leaving the premises during a break. McDonald's in its operations and training manual, in its directions, in the training to the general managers, and in a series of emails and memos sent out by McDonald's to all franchisees, including the Hanes, directed them that they may not allow their employees to leave the premises during breaks. That message was communicated to the employees, to the crew members. It was done indirectly through the franchisee, and as a result, the crew members were not permitted to leave the premises during breaks, which is one of the many violations that McDonald's was directly responsible for causing. And while I say that in absolute terms, the argument here is simply, did McDonald's exercise such control or reserve such a right of control that a jury could conclude that directly or indirectly, or through an agent or other, it suffered or permitted these unlawful conditions, such as through the ISP program, such as through the direction, that it has to ensure that meal breaks or rest breaks aren't given during peak periods? These are jury questions. Ultimately— I don't understand why the peak periods thing is supervision of the employee as opposed to supervision of the franchisee. The franchisor has an interest in promoting and protecting its brand, and part of the idea of a fast food restaurant is it's fast. So a franchisor would not want to ruin its brand by having a fast food restaurant where you wait 45 minutes for your hamburger and coke. There are two ways to deal with that, Your Honor. No one is contending that there should be any interference with customer service. Let me finish my question, so you don't know what it is. If McDonald's tells the franchisee how to run his business, that's not telling the employee anything. I don't think McDonald's tells the employees you have to be on duty from 1130 to 130. I think it's the franchisee's decision, whether it's 12 to 1 or 1130 to 130 or what it is. Am I wrong on that? Actually, to some extent, you're wrong, because the franchise agreement specifically vests in McDonald's exclusive authority to dictate the days of the week and the number of hours that each restaurant has to be open. The business reviewers, and there's examples in the record, specifically told Haynes because it was not staffing up to McDonald's standards, it needed to use fewer full-time employees and hire part-time employees instead. But the point is that because of the ISP program, again, and the fact that it ties into very strict staffing requirements, you have to have a certain number of staff in relation to crew trainers, in relation to managers, based on the training that had been provided through McDonald's. Some people have to be at this station, some people have to be at this station. McDonald's says you have to touch a bump bar after every task. What happens is that the restaurant is very thinly staffed, so during the busy periods, people can't take the rest break when required by law. It's not just that the ISP says that a meal period doesn't come until after 5 1⁄2 or 6 hours, which is a violation of California law right there. It's that because it requires the franchisee to staff as it requires and, in fact, put Haynes on a growth and rewrite for failing to staff as McDonald's required, that when it says ensure that no breaks are given during peak periods, that's why it runs from the problem. If Haynes had additional staff, it could easily avoid the problem. If it used a different staggered schedule, it could easily avoid the problem. But given McDonald's directives, which it enforces through these routine, regular, periodic audits, there weren't enough staff to permit folks to get their rest breaks after the violation. I know your time is out, but I have another question related to the answer you just gave. Yes. Again, the question has to do with dictates or requirements versus incentives. Yes. Is there anything that prohibits a franchisee from hiring, say, one extra person so that everybody gets their breaks? Or is it merely an economic incentive because of the pricing or other reasons? Why? And then after that, I have another question. I'm sorry for taking up so much time. These are largely financial incentives. Growth and rewrite is a financial incentive. Termination is, as in JTH, a financial incentive. It is through financial incentives, threats of default, threats of depriving the franchisee of, quote, programs and incentives for violation of the national franchising standards that McDonald's enforces these directives. But they could be considered incentives. I think that would be sufficient if the jury concluded that it's a practical matter. The franchisee was put in a position where it had no practical economic choice but to comply with that. The reason that I'm asking the question is that in the franchise agreement, one of the paragraphs that you pointed to as supporting your view of the case is paragraph 12. Yes. And the final subsection of paragraph 12 requires the franchisee to follow all state laws. I'm paraphrasing. At the franchisee's expense. So it seems to me that the most relevant piece of the franchise agreement requires the franchisee to follow the state labor laws. That would be one of the state laws that it's required to follow at its own expense. And so I guess that I just have difficulty squaring that with your view that the fact that there are other standards imposed somehow is a directive by McDonald's not to follow those laws. Because of the setting of the ISP, McDonald's, without Haynes' knowledge, caused two separate violations of the overtime provisions, violations of meal period law and rest break law. Haynes didn't know that it committed those violations. Haynes didn't know the depositions show that the ISP was set to provide untimely and therefore actionable meal periods and rest breaks. But whose responsibility is it under this franchise agreement to figure it out? That's where I'm looking at that last part of paragraph 12. Isn't it his responsibility as the franchisee to determine what is required by state laws? Many cases from this court and others say that a principal cannot, by the mere statement of disclaiming responsibility, avoid that responsibility. That would be under the third test. Under the suffer or permit test, it's even clearer. Well, the actual employer also can't avoid by saying, well, I just relied on somebody, what somebody told me, who isn't a lawyer. I mean, if you were just suing the franchisee directly, you wouldn't accept that, I think, as a response to saying you didn't give him the proper overtime. I mean, just to say, well, I didn't know any better? In the franchise situation when McDonald's rolls out, and I would ask the court to look at the rest of paragraph 12, which very clearly, and it's affected through paragraph 18 and 19, states that every component of the McDonald's system and policies must be complied with upon payment of sanctions and list them, including the business manuals, as they may exist or they may be modified in the future, requiring the days that a restaurant has to reopen. These are all requirements. To the extent they're requirements, they're all requirements of the franchisee, not requirements of the worker. That's correct. And to the extent they affect the workers, either. The way you get to be an employer is by telling the workers, do this, don't do that, you're hired, you're fired, you come in at 8, you come in at 11. Those are the things that make somebody an employer under California law. A direction to the employer doesn't make the person who gives the direction to the employer the employer or joint employer. That's not correct, Your Honor. Under Castaneda and under Guerrero, both of which were joint employer cases, there was no power to hire or to fire. The reason there are three independent tests is to avoid the second test in particular, is to provide employer responsibility under circumstances where there is no such direct control. That's why the IWC drafted the wage orders using the specific directly or indirectly language. And the Supreme Court made that clear in Martinez where, and I know you asked about Martinez at the outset, Judge Kleinfeld. It was a very different factual situation because there the produce merchant was one of many. The farmer had four different pieces of land. The problem with Martinez is it's so different factually from the arrangement between the franchisee and the franchisor. It's also different factually in terms of the right to control, the degree of control, the actual control, the responsibility for violations. Yeah, it is. In Martinez, the buyer tells them how to pack the boxes of strawberries. He's out there in the fields with them. And in this case, the franchisor does not. No, in that case, Your Honor, the produce merchant was concerned, as the Supreme Court made clear, with quality control, with making sure the final product, and we have no problem with what McDonald did to ensure the quality of the final product, which is all the Supreme Court said the produce merchant did in that case. In this case, there is micromanagement of the staffing, the bump bars, the no-poach policy, the labor directives that instructed what happens in the event of labor unrest, the specific violations of overtime, rest period, meal breaks that are at issue here, all of which viewed in conjunction would be sufficient to allow the jury to conclude that McDonald's was an employer because it had the sufficient retained right to control and actual control over material terms and conditions, whether it exercised that right of control directly itself. I thought the franchise agreement said the exact opposite of that, but it did not have the right to control the employees. Right, but as I said in response to Judge Graber's question, a disclaimer in a franchise agreement has repeatedly and consistently in every case been held not to have any consequence in determining whether someone actually is an employer under California law. Some disclaimer agreements do, some don't. And it's a jury question. And all we're asking here- Not necessarily. Not necessarily, but in conjunction with the other facts of express directives, ISP, and the action plans that are required that are implemented, the admissions by the Hanes that they felt they had to comply, although I understand that just gives rise to an inference, that is enough to go to the jury on these theories as well as on the negligence theory. Thank you, counsel. We'll give you the full five minutes for your rebuttal. I appreciate it. And we'll add five minutes to McDonald's time. We're looking for 25 minutes on the clock. Thank you. So we're ready to go? All right. You may proceed. May it please the court, Pratik Shah for the McDonald's appellees. If I may, I'd like to start with Judge Graber's point about the difference between contractual requirements and economic incentives because I think that is critical to this case. And the reason it's critical is because the one lesson we can glean from Martinez, factual distinctions aside, the California Supreme Court decision that both sides cited, the most relevant decision, is that economic incentives, and in Martinez they say strong economic incentives and business pressure in matters affecting third parties' employees does not equal employer control. That's at 282 and 283 of Martinez. And what happened in Martinez, they said, you know, that strawberry merchant, they exercised enormous economic leverage over their supplier. And what it said is, look, they can effectively dictate whether they have to fire their workers by pulling their business. They can effectively dictate which fields they have to harvest and all of those things. And what the California Supreme Court said is, yeah, that is true, but that is not employer control. Exercising your prerogative to take your business elsewhere is not employer control. And so I think the distinction between contractual requirements, which even the other side concedes, we don't have here, is that this boils down to economic incentives, albeit strong economic incentives. Well, their evidence suggests, though, doesn't it, that there's more than an incentive that there is perceived at least, reasonably perceived, to be a requirement to use the software package that contains the erroneous labor law information. And I guess my concern with your side of the case is that we're not the jury. We're only here to determine whether there is enough in the record that would permit a reasonable jury to find that there is common law control or some of the other theories, perhaps, over at least some of the terms of employment. Sure. Judge Graber, let me start by addressing the specific ISP issue and walk through the critical record evidence on that, and then talk about more broadly what is required and what is not under the franchise agreements. When you do that, remember that when we are looking at this, we have to look at it in the light most favorable to the plaintiff. Absolutely. And that's what the district court did. And I want to walk through the key pieces of evidence here. And none of these are undisputed. In fact, I'm going to quote from the other side's brief just to take that off of the table. Let me start with the McDonald's testimony. And this part is unrefuted. And this is at ER 1716 where the McDonald's testimony is clear. The ISP is required for one and only one purpose, and that is to open and close the store systems, stale systems, each day. It is not required for the other functionalities that the ISP is required. That's at ER 1716. That is consistent if you look at plaintiff's brief. This is their appeal brief at page 19. I'm going to just quote their last paragraph there. And this is quoting. The record is undisputed that, one, McDonald's required Hanes to use certain technology, including McDonald's for priority point of sale and ISP systems, to open and close each store's stale systems every day. That's just what I had said. Two, Hanes, in fact, used McDonald's ISP for scheduling, timing, and determining other pay-related issues. And that's exactly what Mr. Rubin said up here when you asked him, was it required, he said it's required to open and close, but he didn't answer is it required for the other circumstances. The one thing they say in their brief is because there is no contrary testimony at all on that point. That's why they say that in their brief on 19. What they do say in their brief, and this is at blue brief, page 47, is they say, well, look, effectively it was required because there were no reasonable alternatives to use. But when you look at the record sites that they cite, and I'm going to point you to the key one, it's ER 2975. They're citing to the franchisee's own testimony, right? This is a case where McDonald's, the franchisees, and the documents are all in line. Here's what the franchisee says. Question, have you researched using a different ISP provider? Answer, no, I haven't. That would be a waste of my time. Question, why? Answer, because I know the ISP is offered and it's easy. It's easy to order that rather than having to program something myself. So even the franchisee confirms what the documents and what McDonald's says, and this is what they cite to say that it was effectively required is that testimony. What it shows is it's part of the franchise bargain. Yes, they had a good economic reason. I agree with Mr. Rubin. They had economic reasons to use the ISP because it was offered. Why pay for something else? Why go through the trouble, as the franchisee said, of trying to program something, find something, and buy it? But that is night and day different from employer control. The fact that as a result of the franchise bargain, they are offering resources that the franchisees adopt. But they're offering resources that contain a – that sort of lead the franchisee down the garden path of violating the wage and hour laws in the state of California. So in your view, is McDonald's sort of can wash its hands of liability for that, even though it is sort of factually the cause of these violations? Sure. Your Honor, so first as an analytical matter,  the question is whether they control the wages, hours, and working conditions. It doesn't ask whether they've caused the underlying violation. That's a merits question. Well, it is a merits question. But does that fact, and I want you to assume that it is a fact, bolster or support any of the alternative theories that the plaintiffs raised, that is, but for the use of this McDonald's supplied information, presumably they would not have violated the labor laws? No, Your Honor. And the reason why is for the first and third prongs of Martinez, the hallmark is control. And it's not employer control when the entire use of the system itself is not required, but it's simply incentivized. So that takes it off the table. That leaves the second prong, which is the suffer or permit prong. The suffer or permit prong, the text of the wage order in Martinez that is quoting, is suffer or permit to work. And that is how it's been interpreted by the California courts. It's faithful to the text of the wage order, which says suffer or permit to work. There's no dispute here, or at least no colorable dispute, that McDonald's did not have hiring and firing power over the franchisees, employees. That takes the suffer or permit to work prong off of the table. So in answer to your question. So how do you deal with Guerrero on that issue? How do you deal with Guerrero? So, Your Honor, Guerrero, I've read that case. They say there's no, Guerrero, as you know, they say it doesn't matter. It's the power of the purse that controls and provides for a sense of liability. So Guerrero, when you read Guerrero, and I've read it many times, first of all, it's opaque as to what it's doing. It recites both the prong one and prong two tests together, the control test and the suffer or permit test. And then it marches through a host of things. Why Guerrero is also an odd case because it was the county, through a regulatory scheme that was governing, it was about whether someone who has a disability pays a provider to take care of them once they're approved by the county. And what Guerrero says is, look, there was all sorts of control being exercised by the county. They could effectively decide who gets hired and fired by withdrawing the authorization. They effectively controlled the wages because they were the collective bargaining representative in that case. That wasn't a kind of a run-of-the-mill suffer or permit. I agree. It's actually different. But the whole thing is that you don't necessarily have to hire or fire or control that. It said the power of the purse. What it said, Your Honor, is you don't directly have to hire and fire. And we agree with that. But it did find, in fact, that they had indirect firing and hiring power. And this is a quote from Guerrero. Not a quote. I'll paraphrase it from Guerrero because I don't have it in front of me. It says the county essentially exercised the hiring and firing power because it could withdraw the authorization to have that provider at any point. And so that satisfies our construction of suffer or permit. What is your response to counsel's argument that paragraph 14 in the franchise agreement, which says you can't hire anybody who's worked for another McDonald's basically recently. Again, I'm paraphrasing. Which is a direct control over who may be hired. So two responses to that. First, Your Honor, they did not cite that provision to the district court. As you know, on some of the- It's in the record. We review this de novo. Sure. But there is pretty clear law that if you're moving for a disputed issue of fact on control, you have to point to the-you can't just- Well, don't- You have to point to the evidence- Move on to your other question. Okay, sure. Let me move on to directly answer your question on the merits. That is a very modest limitation. Here there is undisputed testimony in the record that what these franchises did, they had full control over hiring. They decided the pool of folks. They decided who to interview. They decided they didn't use McDonald's hiring to win interview guides or evaluation metrics. Their managers interviewed everyone. They decided who to hire. They decided when to discipline them. They decided when to fire them. None of that is rebutted. That is consistent with McDonald's testimony. That's consistent with plaintiff's testimony. That's consistent with the franchisee's testimony. So all we have is this modest limitation in 14. So if a franchisor said, you know, our stores have really low ceilings, and so you can't hire anybody who's over six feet, that wouldn't be sufficient to show control over hiring in your view because it's a modest limitation at the margins. I think so, Your Honor. And this one in paragraph 14 is particularly one that shouldn't trigger joint employer liability because it sort of flows from the integrity of the franchise system. The reason paragraph 14 was in there was to preserve the integrity of the franchise system that you don't take one employee from another. That you don't steal from another. This was not some macro limitation on the hiring capabilities of franchisees. I mean, it is undisputed in the record that the Haynes did what they wanted with hiring. And because this wasn't raised in the district court, there is zero evidence that they can point to in the record that this paragraph 14 actually affected anything with respect to their hiring, firing, disciplining, or all of that. And so if that's the best, and that is the best they have on hiring and firing, then that doesn't come close. I mean, if you look at Patterson, the common law prong three definition in the Dominos case, there was much more specific stuff about hiring, about the drivers and Dominos pizza delivery guys, the driving record, the age requirements, all of that stuff. You don't have any of that stuff in the McDonald's case. Now, to get back to the macro point, Judge Graber, because I think it is critical about contractual requirements versus incentives, I walked through the evidence on ISP, which is not a close call as the district court found. Judge Kleinfeld, you asked about the break policies. Let me walk through that. And they said that the ISP is their lead claim. Their next best claim, as you pointed out, is the security guidance about not letting anyone. What I was thinking specifically was control over labor policy. It seems like whether your employees can leave the building or not is a pretty significant part of labor policy. And if state law says they can and McDonald's says they can't, that sounds like a problem. And that's why I want to address it, because it is, I think, their second claim, really. And they cite two sets of documents. And I think, again, because we're on summary judgment, the record is critical here. They cite two sets of documents. The first are ER-7104 and ER-7108. Those are two e-mails. If you look at those e-mails, those are e-mails describing a burglary, a recent burglary that happened at franchise locations. In response to that burglary, they issue, and this is the quote, security recommendations. And under the security recommendations, they say don't let anyone out of the lobby when it's dangerous at night, once the restaurant is closed. So this isn't what they're relying on to say that there is express dictate required by the franchise agreement. This has nothing to do with the franchise agreement. It doesn't have anything to do with anything mandatory. It's a security recommendation e-mail. Now, the second document that they cite, which Mr. Rubin mentioned, is the operations and training manual. That's at ER-7026. That page of the operations and training manual does say, and now it's not directed at labor control or at employees, it's part of the security chapter. And what it says is, look, if you're operating a restaurant late at night, once the lobby is closed for safety reasons, don't let anyone out. What they don't cite is 15 pages before that, ER-7009. That is the introductory section to the security chapter. And what that says is that this guidance in this security chapter, while it is required for company-owned, corporate-owned McDonald's restaurants, it is optional guidance for franchisee locations. That's at ER-7009. They don't cite that. The reason why that's critical, of course, goes to Judge Greb, your point about differences between contractual requirements, mandatory directives, and guidance. That's what this is. And the operations and training manual, just so you guys have a picture of how the McDonald's system works. The don't let anyone out rule that I was concerned with is expressly optional for franchisees. Expressly optional in every document that they cite in the record, ER-7108. We're not giving grades to the briefs. What I care about is what's in the record, not what they cite about the record. No, you are absolutely right. It is not a required policy for franchisee. It is only required for company-owned restaurants. That's expressly stated at ER-7009. Now, the reason why this operations and training manual, this comes up a lot in their brief. The reason why is, so the franchise agreement, which you've all read in paragraph 12, it's pretty bare bones. And then they, of course, point to the language, well, they still have to comply with other McDonald's standards and policies. Where most of those come from, the lion's share of those come from, are from the operations and training manual. Now, how that operations and training manual works, it's a chapter-by-chapter manual. There's a chapter on people practices. That's really the one that governs personnel stuff. There's one on training, crew schedule and crew management and scheduling. Those are the ones that really come closest to labor policy. Judge Kleinfeld, to use your term. The critical part they cite from various provisions in that manual is to look at the introductory section of each of those chapters. And I'm going to give you the pin site for each introductory page. And they include exactly the same sort of language that I read you from the security chapter. That this ONT manual is mandatory for company-owned and operated restaurants. But it is optional guidance for a franchisee to use to the extent it benefits the operation of their particular circumstances and their employees. Now, first is the people practices chapter. That's ER 6688 to 6889 or 8757 to 8758. There's the training chapter. That's 8766. There is the crew management and scheduling chapter. That's 8774. Now, the district court figured this out. And this is laid out in the district court's opinion. It starts at ER page 36. Page 10, 11, 12, 9 through 12 of the district court's opinion, really 9 through 18. Where the district court looked at the operations and training manual and read it cover to cover and found, look, the chapters that they're citing from, those are optional guidance for that. And not only is it in the black and white and the text of those pages that I gave you. That's the testimony from McDonald's. That's the testimony from McDonald's franchisees. That's aligned with the documents. And in light of that, the district court quite properly found there's not a triable issue of fact. Those chapters that all of the ones that touch on personnel practices are in stark contrast to other chapters in the operations and training manual that, for example, food safety and service, that do say certain provisions are mandatory not only on company-owned restaurants but on franchises as well. But those don't have to do with personnel practices. Those have to do with things about how you make a Big Mac and how you have to keep the meat safe and those sort of things. And so when you look at how the franchise system is set up and how the franchise agreement interacts with the underlying manuals, and that's what the district court properly did, there isn't a colorable dispute of fact or a genuine dispute of fact that gets you to a jury. What we have now is a lot of best practices and a lot of guidance that McDonald's provides. That's part of the franchise bargain. It's providing all of these resources to the franchisee to adopt in conformity with state law and in conformity with what it thinks are its best practices. At most, and you see this throughout plaintiff's appeal brief, they use the word effectively, effectively required, effectively required. At most, you have economic pressure through the growth and rewrite process that McDonald's uses. But as Martinez, again, California Supreme Court is controlling law on this, that sort of business pressure, even strong economic incentives or business pressure, as a matter of law does not constitute employer control under any of the three prongs of the wage order test interpreted in Martinez. Am I right in my recall, and Martinez is really long, but as I recall, the strawberry buyer who was telling the pickers what to do got off. Yes, they were not a joint employer, and it's important to notice that's despite the fact Basically, the putative joint employer, the California Supreme Court said no joint employer liability, you're right. And that's despite the fact that the putative employer sent representatives on a daily basis to work and train the strawberry pickers in the field, correct their mistakes directly. That was day-to-day, on-the-field supervision. During a strike, they lobbied the workers to come back to work. They paid advances to the farmers in that case so they could pay wages. And, of course, they exercised the enormous economic leverage that's discussed on pages 282 to 283 of Martinez. The buyer supervised the pickers in the field on a daily basis and still beat the claim. Correct, that's exactly correct. Not only did they supervise them on a daily basis, they paid advances so that they could pay wages. They lobbied them to return when there was a strike. And, again, I think the critical point for this case, the legal rule that allows you to cut through all of this fact evidence, is that economic leverage as opposed to contractual requirements and control is not enough. Let me change topics for a minute. Looking at the ISP system and assuming, for the sake of argument, that it was constructed in a way by McDonald's to cause wage and hour problems, why isn't that a tribal issue of fact under their negligent supervision theory? Sure. So the negligent supervision theory, the problem that they have there, and as the district court correctly pointed out, is the Brewer case from the California Court of Appeals. And what that said is once you have a statutory regime, that is, through the California labor code, that supplants the common law, it's created new rights, then that becomes the exclusive means of relief when you're talking about things that arise from labor code violations. So the premise of their negligence thing— But if we accept your theory that you're not a joint employer, if we accept that theory, then isn't the negligence theory viable independently? No, and here's the reason— I'm basically saying wage and hour should control this issue, but we aren't an employer. We caused the problem. Why isn't it viable? Two responses to that. First, the predicate of their negligence theory, even if you assume, as you showed, that we went on joint employer, the predicate of their negligence theory is that there were labor code violations. That's the injury that they are— But there's sufficient evidence, in my view, to withstand summary judgment on the existence of violations. Sure. And we're not disputing that, Your Honor. Okay. Well, it sounded like you were. No, because to the extent you're talking about the merits, I don't want to argue the merits of whether or not McDonald's system caused actual labor code violations. That's not been litigated in this case. The only issue that's been litigated here is joint employer and whether the negligence theory can go forward, even assuming that McDonald's system did cause some labor code violations. And the Brewer case, what the Brewer case says, and that's why it's controlling on this negligence point, is if you're relying on labor code violations, then your exclusive means of relief is to go through the labor code, and, Chief Judge Thomas, to answer your question, you then do have to show that they're an employer. And they do have a remedy under the labor code. The labor code, the remedy is against their actual employer, which is paying partnership. Right. I mean, their theory here is that their actual employer, with respect to the ISPs, their actual employer didn't cause the problem, but some external force did. So it seems to me, I understand your theory as to exhausting through the employer, but you're also saying that means, conversely, that any other causative factor is immune from liability. Well, so I guess I would view it as for employees, like plaintiffs here, the labor code provides them their exclusive means of relief for labor code violations. So let me give you a hypothetical that isn't this case, obviously, but I want to sort of test where you're going with this. Okay. Let's say that someone worked 14 hours in one day without getting paid overtime, because a crazy person came into the restaurant and held everybody hostage for the 14 hours, but the franchisee said, well, I'm not going to pay them. Assuming that the crazy person was well-to-do, couldn't the employee also sue them as having caused the violation? I guess that's very sort of, to my mind, analogous to the question about a non-employer. Can a non-employer be sued? Maybe they can find, in that circumstance, a different theory, but to me the proper way that would work is for the employee still to sue its employer, the franchisee, and say, look, you didn't pay me. Now, it would be open to the franchisee, just as it's open to the franchisee in this case, to sue McDonald's and say, you supplied us defective software, or in your hypothetical. But why couldn't the employee sue them both? Well, the reason is because the labor code. If they're suing for a labor code violation, and ultimately these are all labor code violations, that's the only obligation from which you get overtime and minimum wage. Can I sue the crazy person for causing them to be stuck there for 14 hours? Yeah. Look, Your Honor, in that circumstance, maybe they're sued. Certainly the franchisee. So here's how the labor code, I think, is supposed to work in that sort of hypothetical. The employee sues the franchisee. You have to pay us. It's clear in black and white. You have to pay us. We were there 14 hours. They then recover from the franchisee. Now, the franchisee is free to sue the crazy person, who's well to do in Judge Graber's hypothetical, and recover and say, look, you caused us to violate the labor code. You have to recover from us. Just like it was open in this case. Can you sue the crazy person? I'm sorry, Your Honor? I thought the crazy person held the employees hostage. So I'm asking, which I think is in line with Judge Graber's concern, why couldn't the employee sue the crazy person? Well, they might be able to sue them for false imprisonment or something like that, but they can't sue them for a labor code violation because they're not an employer. Your argument would be they can only sue them for a labor law violation. No, I'm sorry. Not the crazy person. They can sue the franchisee, the actual employer. Oh, I'm interested in the employee suing the crazy person. Okay, right. Because the crazy person is not the employer, I'm inferring they could. Sure. And I think the questions raised by Judge Graber and Judge Thomas would relate to the idea that if National McDonald's is not the employer, why can't they be sued for negligence? Your Honor, it's because of Brewer. And what Brewer says is once the labor code is set up, a regime, as they found this is new rights beyond the common law, and therefore it's part of the new right exclusive remedy doctrine. It gives the employees an exclusive remedy for labor code violations. Because there's no common law right to a particular meal period or rest period. That's right. Any time period. That's right. And in your hypothetical, I agree. Look, there may be other causes of action that don't have to do with labor code violations that they could bring against the crazy person. They could bring a false imprisonment action, recover damages there. And, again, in this case, the defective software. It's all about labor law violations. It's all about labor law violations. Nothing would stop Payne's Partnership from suing McDonald's and saying, you've provided us defective software. You know, maybe that suit could go forward. That's obviously not what we have here. We have the plaintiff employees trying to recover for labor code violations, and that's not permitted under Brewer. One other quick question before we slow down. To the extent that we have some doubt about the reach of Brewer or how the sufferer permit prong under Martinez would be construed by the California Supreme Court, why not certify those issues? Your Honor, I don't think it's necessary to certify because the cases are clear enough. And let me give you the best data point, and this is not a case we've talked about yet, but it's an important one because it postdated the briefing. It's the one we brought to the Court's attention in our 28J letter. That's the Curry case. That's from the California Court of Appeals. It was issued in May 2018. It is on point, more than any other case, on the facts of what we have here. And what that case, it addressed directly the sufferer permit argument that plaintiffs are making here. It analyzed Martinez, Dynamex, all of the precedents that are cited in these cases. And what Curry says, California Court of Appeals published decision. What it says is, look, the wage order says suffer or permit to work. It doesn't say suffer or permit the unfair labor code violation. And so we're going to apply the text. We're going to apply it consistent with Martinez and reject the argument that plaintiffs are making here. And that was exactly the same argument they made in Curry. And what the Court said is, look, because the company there, Shell, who contracted out its service stations, did not have the plenary power to hire and fire, we're not going to find them to suffer or permit. Two notable points about Curry. One is the facts in Curry are much better for the plaintiffs in Curry than they are here. And still the Court said no because Shell actually did have the power to fire the employees of the contracted service stations for a good cause. And what the California Court of Appeals said, well, that for good cause is not enough. They have to have plenary power. That's one point. Our case is much easier. The second point is the California Supreme Court, the plaintiffs in that case, sought review from the California Supreme Court. The California Supreme Court has already, the one update I'll give you, since our 20-A-J letter, the California Supreme Court has denied review in that case. This is a diversity. Does that have any meaning? We know with Supreme Court cases, denial of cert basically means nothing because of the many reasons that it can happen. Is that true in California as well? Sure. I don't know the cert standards as I do as well for the federal standards, so I'm not relying on it that it's conclusive. But what I will say in a diversity case like this, the Court looks at the California Supreme Court decisions, of which there are ample decisions here between Martinez, Patterson, and Wright, and then the California Court of Appeals decisions, unless there's some reason to think that the California Supreme Court would reject them with the Ninth Circuit, what your court's law has said is those are indicative of California Supreme Court rulings unless we think. It's all governed by state law. Right. It's governed by state law. And Curry, we would. Your short answer to my question on certification is you don't think so because of Curry. Because of Curry and the other cases, and the other side hasn't asked for it either. Well, I know that. I do want to give sites to the record to respond to factual points that we strongly disagree with. I'll start with this, which is, yes, the Goon-Mardeen case, which is now up before the California Supreme Court, addresses whether a payroll provider can be liable for negligence for violations of California wage and hour law. So that's one issue. Counsel, liable to whom? The employer who hired? No, liable to the employees, which is the example I think the bench was discussing, liable to the employees for negligent hiring the payroll provider. But the second point on sufferer permit, there are two questions that are open before the California Supreme Court. One is whether it's just sufferer permit to work. Our position is it's sufferer permit to prevent the unlawful conditions. And Martinez itself says that the Supreme Court was focusing on the duty of seeing to it the prohibited condition does not exist. What about Curry and what about Brewer? Curry is the first court of appeal case to address the issue. Review was denied. The issue is still open. But why is that so? We regularly have said that when we're looking at state law, a published intermediate appellate court decision is binding on us, unless we believe that it is inconsistent with what the Supreme Court would do. And why do you think that Curry is inconsistent with what the California Supreme Court would do, other than that you would like it to be different? No, no, no, no, no. Precisely because in Martinez, which Curry was seeking to construe, there are two reasons. The first is Martinez expressly said in relying on the common law cases, some of which we cite in our reply brief at 19 and 20, and Martinez itself cites Sheffield Farms and Pertell, the duty is not to prevent work. That's true in a child labor case when someone is working and they're a minor. But when it's an unlawful conditions case, it's suffering or permitting the unlawful condition to exist. So Martinez is the view of the Supreme Court on the issue, not Curry. That would be a reason to certify. The second reason would be because Dynamics is a real question. The court in Dynamics cited the Massachusetts Jan Crow case. I understand you rely on it, but to me Dynamics is dealing with such a completely different issue. That's correct, but it relies on the Jan Crow case in which Massachusetts court, using the same ABC test the Supreme Court adopted, applied it both in the independent contractor employee context and in the joint employer context, and therefore we think it's an open question. But let me address the facts because we seriously disagree with some of the statements, and most importantly we believe that a jury would seriously disagree with most of those statements. There is a reason why a jury could conclude that Bobby Haynes, Jr. expressly stated that the franchisee was bound by the national franchising standards, and there's a reason why a jury could reasonably find that it was McDonald's that was enforcing the people standard. That's the standard that counsel just said was optional. The people standard caused this franchisee in 2014 to be held ineligible for growth and rewrite. So the question is how could McDonald's have punished this franchisee for violating a standard if that standard was entirely voluntary, and the answer to that is- Can we look in the record to see what McDonald's said was the reason for limiting the Haynes franchise? The 2014-yes, there are two letters right after each other, 2012 and 2014. I'll get them for you in a moment, Your Honor. But it was expressly stated that the growth and rewrite was denied for financial reasons in 2014, and financial reasons for not complying with the people requirements in 2014. There are express directives in the record for McDonald's as a result of the audits, pages 7336 to 7413. The ISP requirement is explained not only at pages- I'm trying to figure out exactly why their franchise was threatened. If it's that the inspector came and he had to wait 45 minutes for his hamburger because he thought there wasn't enough staff there, that's one thing. And if the franchisor said there's noncompliance with our standard for break time, that's another thing. That's another thing, and here it was because of the people standard in the operations and training manual which had the number of staff, where they're placed, the SSP, the shift scheduling positioning system, the variable labor hours, the termination of where folks have to be. If you take a look at 7336 to 7413, if you look at Catherine Slater Carter's declaration, pages 8674, our statement of undisputed facts at 7290 to 93, these cite the evidence in the record that show that this franchisee was punished for not being in compliance. And the franchise agreement- I'll go back to Judge Graber's question- Not being in compliance with what? A franchise agreement requires strict adherence to the McDonald's system. It defines the McDonald's system as including all of the standards and policies. It doesn't say any are voluntary. It incorporates them expressly, and it states that those are the policies-this is back to the JTH case- in existence now or as they need to be modified unilaterally. You're saying McDonald's imposed a sanction on the franchisee for not complying with policies. With the people policies. They must have told the franchisee precisely what the franchisee was doing wrong. Yes, they did. I keep asking you questions intended to elicit that, but I don't understand the answer yet. The answer is that in 2004, the franchisee did not comply with the people section. What part of the people section? Staffing, scheduling. There were inadequate staff. There were inadequately trained staff. There weren't enough managers that had gone to Hamburger University, which is a requirement for all general managers. The bump bars weren't operating properly. There weren't enough part-time employees. There were a whole series of requirements that McDonald's imposed that in addition to the usual failing rates and criticisms, McDonald's included as a whole- What are bump bars again? Bump bars, every time someone performs a task so that the ISP can see how efficiently and how quickly they're working behind the scenes. This has nothing to do with customer service. You have to press a bump bar, and at one point they're required by McDonald's. On the inadequate staffing, isn't staffing left to the franchisee, but the franchisor can say, if you're not staffing enough, isn't that the way the deal works between them? And what happens if the franchisor- You can hire two people or 20 people, but if the inspector comes in and waits 45 minutes for his hamburger- No, and that's ultimately the fact question. This gets back to the question about incentives versus requirements. If McDonald's can grade a franchisee based on the data that comes out of the ISP, showing whether it has the right staff, the right trained staff, in the right positions at the right time, and can mark a company down, put them in IPER, deny them growth or rewrite, ultimately have the power either to seek specific performance or an injunction in a court action, paragraph 19, or terminate the agreement, paragraph 18, that is a right to control material terms and conditions- But that goes- that begs the question of whether they have to use the ISP in the first place for these other purposes. And the answer to that, Your Honor, is page 8674, paragraph 30. The deposition page that was cited before was 2975, so you continue that to 2996, where they're talking about the ISP and its settings, and our statement of undisputed facts at paragraphs 39 to 43, all pertaining to the mandatory use of the ISP- But it's mandatory for certain purposes and not all purposes, as I understand it. Is that true, yes or no? Yes, it's mandatory- But it's not mandatory for the wage and hour purposes, is it? It is only mandatory under the franchise agreement for opening, closing, and point of sale, but as a practical matter and as a jury could find, because the system requires grading on data that can only be generated through the ISP, there's a reason every single franchise has the ISP, and that's because the system wouldn't operate without it. So although the requirement is not expressed, a jury could draw the reasonable inference, as Catherine Slater Carter stated, as this other evidence shows, that the only way McDonald's can- I don't see why that follows as a permissible inference at all. It's like saying we give everybody WordPerfect for free, but they're free to use any other word processing system they like, and then you look and you see everybody's using WordPerfect. That must mean it's mandatory. Look, to add one more fact, you're hypothetical. You are the senior attorney in the office. All of your associates have WordPerfect. You edit. You don't know how to use Word, but you say, WordPerfect is optional. I am the final editor of the brief. You're getting WordPerfect for free. You're welcome to use Word, but I'm the one who's ultimately responsible. I'm going to grade. I'm going to have to look to see whether your reveal codes are working effectively. I can't do that in Word because Word has no reveal codes function, and I can't edit the brief before being converted. That's a fact question as to whether it's required. That's where Martinez shoots you down. It says even this very strong incentive is not enough to make somebody an employer. The strawberry buyer lost the case. Correct. And if you go to page from 70 to 72, in particular 72, it shows you why the strawberry produce merchant was held not to be an employer. Two reasons. One, it was only focusing on quality control of end product, and here we have a whole range of activities that don't bear an end product. And two, the financial incentive, it was binary. It was either pull all the work or don't pull the work. There were no intermediate steps, and more importantly, the court said expressly, that economic power was not strong enough to create an inference of control because unlike this case where there's the franchisor and the franchisee and those are the only two parties, in that case the farmer, Munoz, dealt with three other produce merchants, had other land, had financial problems because of the dealings with the Ramirez company entirely separate. The fact that one of its produce merchants could quit wouldn't put the farmer out of business. That was one factor in a complicated financial arrangement. They had independent sources of revenue and independent problems. Do you think the reason that the strawberry buyer won his case is that the farmer could have sold the strawberries to somebody else? Yes, and in fact did and had other farmland in which he sold it to other people, and that's what the Supreme Court said. And if you look in particular at the declaration of Catherine Slater Carter, she is a franchisee in California. I don't think the Supreme Court said that that was the reason that the strawberry buyer won in Martini. I believe at pages 70 to 72 of the Cal Fourth opinion it did, Your Honor. We can take a look at the opinion. I will certainly look again. Catherine Slater Carter makes very clear why franchisees construe not only the express directives and the action plans but the overall control expressed by McDonald's as requiring them to impose certain workplace conditions. There's a reason the franchisees allowed Littler Mendelsohn, paid by McDonald's, to give them advice on labor protests. There's a reason there's a whole California demonstration manual. All of the policies, the nine-in-one policies in the courtroom mandated by the NRBES, the Business and Equipment Standards, those all come from McDonald's. McDonald's sets the no harassment policy. McDonald's set the no poaching policy. McDonald's set the anti-solicitation policy and required this. There's no question about it being optional. Required those posters, those policies, those requirements. It trained the managers. It provided the orientation materials in the packets. Are any one of those factors enough? Are any of those factors enough coupled with the direct violations? That's for the jury to decide ultimately, Your Honor. Thank you, counsel. Thank you. I know that we asked you for some citations to the record, both sides, and so if both sides want to afford the opportunity to supply those through a 20HA letter, it would be better before the end of the week, but I won't set a time period on it. If you want to wish, I don't want any briefing, but at least you want record citations or a case citation, feel free to submit those. Thank you. Thank you. The case is ordered to be submitted for decision, and we will be in recess for the morning.
judges: Kleinfeld, Thomas, Graber